**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Thomas Noree,

                              Plaintiff,

                                                    Civ. No. 03-6215 (RHK/AJB)
                                                    **MEMORANDUM OPINION**
                                                    **AND ORDER**

v.

Northwest Airlines, Inc.,

                              Defendant.

---

Craig A. Brandt, Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, Minnesota, for Plaintiff.

Tracy J. Van Steenburgh and Sandra L. Jezierski, Halleland, Lewis, Nilan & Johnson, PA, Minneapolis, Minnesota, for Defendant.

---

**Introduction**

This is an employment discrimination case. Plaintiff Thomas Noree has sued his former employer, Defendant Northwest Airlines, Inc. ("Northwest"), alleging a hostile work environment and discriminatory discharge. Before the Court is Northwest's Motion for Summary Judgment. For the reasons set forth below, the Court will grant the Motion and dismiss Noree's Amended Complaint.

**Background**

I.      **Noree's Work History**

Noree was born in Thailand and emigrated to the United States in the early 1980s.  In June 1995, he was hired by Northwest as a mail specialist in Minneapolis.  He received favorable reviews.  In May 1998, he was promoted to Customer Service Agent at the St. Paul-Minneapolis International Airport (the "Airport").  Customer Service Agents issue tickets, book reservations, check baggage, and issue boarding passes, among other things. Noree also received positive reviews in this position.

In June 2002, Noree was promoted to a Customer Service Supervisor position in Albuquerque, New Mexico.  While his family remained in Minnesota, Noree transferred to Albuquerque.  Customer Service Supervisors supervise Customer Service Agents and perform many of the same duties as the Agents.  The Albuquerque branch was initially managed by interim manager Dave Freeland.  On August 12, 2002, Jennifer Lahti succeeded Freeland to become the Albuquerque branch manager.  Northwest's Regional Director for the Western United States, a territory that includes Albuquerque, was Mark Horvath.  On August 16, 2002, due to the events described below, see infra Background Part IV, Noree's employment was terminated.

**II.     Northwest's Policies**

    **A.     Rules of Conduct**

Northwest has established Rules of Conduct for its employees, which are conditions of continued employment.  (<u>See</u> Noree Dep. Tr. Ex. 2.)  It publishes these rules in a handbook provided to employees.  Noree received a handbook and is familiar with these rules.  (<u>See</u> Noree Dep. Tr. at 61-62.)  The Rules of Conduct require honesty (Rule 9) and cooperation with the company (Rule 10), and prohibit theft (Rule 25), conflicts of interest (Rule 30), and false claims for pay (Rule 33).  The Rules of Conduct also govern the use of nonrevenue and reduced rate travel privileges (Rule 28).  Violation of any of these rules can result in termination.  (<u>See</u> Noree Dep. Tr. Ex. 2.)

    **B.     Ticketing Guidelines**

Northwest permits its Customer Service Agents and Customer Service Supervisors to use their discretion in reasonably solving passenger problems.  For example, a May 1999 Northwest memorandum, which was circulated to all Customer Service Agents, states:

> YOU HAVE THE AUTHORITY TO REASONABLY SOLVE A
> CUSTOMER'S PROBLEM.  YOU CAN "BREAK THE RULES."  JUST USE
> YOUR GOOD JUDGMENT AND EXPERIENCE AND DO WHAT'S RIGHT.
> . . .  Your best judgments each and every day will more than satisfy the
> customer.  You will retain the customer.  You are good at your occupation;
> you know what is fair—now you have the authority to do it.

(Brandt Aff. Ex. 18.)  Similarly, a September 1999 memorandum told Customer Service Agents that, "Customers want to be handled to their satisfaction with the first person they come in contact with at Northwest.  Solve the customer's problem!"  (<u>Id.</u> Ex. 19.)

Likewise, in 2001, Northwest's Chief Executive Officer authored an article in a company newsletter titled "Every employee has authority, duty to fix customer problems," and wrote, "I can't overstate that everyone has the authority—and the obligation—to solve customer problems on the spot.  That means being flexible.  If the customer has a problem, don't wait for them to suggest or demand a solution.  Take the initiative and offer one.  When we provide good service recovery, it works to our benefit in the long-term because our customers know we will take care of them."  (Id. Ex. 20.)

Northwest also has a written policy limiting the amount of ticketing fees Customer Service Agents and Customer Service Supervisors can waive without getting permission. According to a September 5, 2001, memorandum:

> It is company policy to collect all fees.  This should be standard practice.
> However, it is recognized that there may be situations which warrants a
> waiver of the fee.  On these rare occasions:
> –Think of it as if it were your own money; "you would collect for services
> rendered"; and
> –While you may not agree with the fees, these are [Northwest's] fees.

(Horvath Aff. Ex. A.)  Under this policy, Customer Service Agents may waive fees up to $100 per ticket, and Customer Service Supervisors may waive fees up to $300.  (See id.)

### C.      Travel Pass Policy

Northwest permits its employees to travel on a nonrevenue or reduced fee basis on Northwest flights and other carriers under certain circumstances.  According to Northwest's travel pass policy, however, employees out sick from work due to a short term illness that requires daily notice to their manager "ARE NOT ELIGIBLE (NO EXCEPTION) FOR ANY PASS OR REDUCED RATE TRAVEL DURING THE CALENDAR DAY OR DAYS OF SCHEDULED WORK FROM WHICH THEY ARE ABSENT."  (Horvath Aff. Ex. B.)  In addition, "EMPLOYEES ON ANY TYPE OF LEAVE ARE NOT ELIGIBLE FOR FREE AND REDUCED RATE TRAVEL ON NORTHWEST AIRLINKS/KLM OR OTHER CARRIERS DURING LEAVE."  (Id.)  Northwest's website also notes that it is a "misuse" of the pass and reduced pass travel privilege to "travel[] when sick." (Brandt Aff. Ex. 33.)  It also notes that misuse of the privilege may subject an employee "to suspension and/or revocation of those privileges as well as reimbursement of fare and other disciplinary actions up to and including termination for flagrant and intentional misuse."  (Id.)

### D.      Disciplinary Process

Under its labor agreements, Northwest follows a progressive discipline system.  The first disciplinary step is "coaching."  The next step is "Level 1," which is active for a defined period of time.  If the employee commits another infraction while on Level 1, a "Level 2" is issued and is active for a defined period of time.  The next level is a "decision-making leave."  A manager may terminate an employee without progressing through each

5

step, but the manager's regional director and Northwest's Labor Relations office are to be

contacted first.  (See Brandt Aff. Ex. 8 at 28-34.)

## III.    Working Environment

Noree alleges that a racially and national-origin-based hostile work environment

existed in Minneapolis and in Albuquerque.  His allegations are as follows[1]:

- **Allegation 1:** In May 1998, supervisor Steve Smith told Noree that Northwest did not need a Thai interpreter at the Minneapolis Airport.  (See Pl.'s Interrog. Answer at 3.)

- **Allegation 2:** In October 1998, supervisor Glenice Toledo, who is Filipino, issued Noree a Level 1 for failing to report for work on time, although Noree contends he had been told to report later.  (See Pl.'s Interrog. Answer at 3-4.)

- **Allegation 3:** In November or December 1998, supervisor Glenice Toledo told Noree that she thought he was from Laos.  (See Pl.'s Interrog. Answer at 4.)

- **Allegation 4:** In December 1998, Customer Service Supervisor Mark Schuller told Noree "in an aggressive tone" to work in the bag check area, and "threatened" to send him home if he did not.  At the bag check area, Customer Service Manager Gerry Murphy also told him to work bag check or go home. (See Pl.'s Interrog. Answer at 4-5.)  Noree filed an internal complaint about the incident.  (Brandt Aff. Ex. 24.)

- **Allegation 5:** In early January 1999, an unspecified person at Northwest issued Noree a Level 2 for allegedly failing to report to a gate for a work assignment.  (See Pl.'s Interrog. Answer at 5.)  Noree grieved his discipline to his union.  (See Brandt Aff. Ex. 25.)

---

[1] In support of his claim, Noree has identified numerous instances of allegedly harassing conduct.  (See Mem. in Opp'n at 10-19.)  For convenience, the Court has numbered the allegations "**Allegation 1**," "**Allegation 2**," and so on.

- **Allegation 6:** In 1999 or 2000, Customer Service Manager Paulette Stewart told Noree to "be careful with what you are doing" because "someone is trying to get you in trouble." (See Pl.'s Interrog. Answer at 5-6.)

- **Allegation 7:** On most occasions, Paulette Stewart "made fun of Mr. Noree's accent," but Noree "does not recall the specific words she used." (Pl.'s Interrog. Answer at 5-6.)

- **Allegation 8:** In 1999 or 2000, Cathy Easler, an administrator in supervisor Steve Smith's department, issued Noree a Level 1 for working more hours than allowed. (See Pl.'s Interrog. Answer at 6.) Co-employee and union steward Gayla Hiar told Noree that she had never heard of anyone receiving a Level 1 for this reason. (Id.)

- **Allegation 9:** In the summer of 2000, Noree saw an unidentified supervisor "harassing" co-worker Edida Lorell, who is Asian-American, by "yelling and pointing his finger at her" in public. (Pl.'s Interrog. Answer at 6.) Later that day, Customer Service Supervisor Gil Schuckman spoke to Noree about what happened, but did not seem to care and, to Noree's knowledge, did not do anything about it. (Id.)

- **Allegation 10:** Shortly thereafter, Schuckman denied Noree's request for ten days off to visit his dying sister in Thailand, and gave him only one day off. (See Pl.'s Interrog. Answer at 6.)

- **Allegation 11:** Later, after Noree returned from Thailand to see his sister, Schuckman falsely accused Noree of being "AWOL." (See Pl.'s Interrog. Answer at 6.)

- **Allegation 12:** On November 12, 2000, Schuckman accused Noree of misconduct involving booking a seat under his own name and generating bag tags for a customer who wanted a fare quote. (See Pl.'s Interrog. Answer at 6; Brandt Aff. Ex. 26.)

- **Allegation 13:** Also in November 2000, Schuckman confronted Noree as to whether he had given a Northwest complementary phone card to his father. (See Brandt Aff. Exs. 27 at 9, 28 at 5.) On November 30, 2000, Noree filed a second internal complaint alleging a racially hostile environment, which focused on Schuckman. (See Brandt Aff. Ex. 29.)

- **Allegation 14:** In December 2000, manager Bimal Vadhani issued Noree a "coaching" level discipline for allegedly leaving work early, while "[o]ther persons who were not Asian or of Thai national origin who acted the same way were not similarly disciplined." (Pl.'s Interrog. Answer at 7.)

- **Allegation 15**: In September 2000, a supervisor named Regina told Noree that someone was trying to get him in trouble by saying that he had improperly changed tickets for his father's trip to Thailand. (See Brandt Aff. Ex. 27 at 8-9.)

- **Allegation 16:** In or about 2000 though 2002, co-employees Terri Jackson, Lillian Choi, and one other person searched the garbage in Noree's work area "in an apparent effort to find evidence to use to argue that Noree was not performing his duties properly." (Pl.'s Interrog. Answer at 7.) Noree reported this activity to supervisor Mike Manigan. (Id.)

- **Allegation 17:** In December 2001, supervisor Manigan was told that Noree had improperly upgraded a passenger ticket, but subsequent investigation revealed that co-worker Laura Bailey had made the upgrade. (See Pl.'s Interrog. Answer at 8.) To Noree's knowledge, Bailey was not disciplined. (Id.)

- **Allegation 18:** On several occasions in 2001, supervisor Manigan told Noree not to talk to co-workers while working at the ticket counter. (See Pl.'s Interrog. Answer at 8.) After Noree met with Manigan and a union representative, it was decided that in the future Manigan would speak to Noree in private about his behavior. (See id.) From that point on, Manigan never spoke to Noree again. (See id. at 9.)

- **Allegation 19**: In the Spring of 2002, while Noree was considering a transfer to Alabama, an unnamed manager from Alabama "painted a very negative picture of the situation there and strongly discouraged [him] from accepting that position." (Pl.'s Interrog. Answer at 9.) During the same time period, Noree expressed interest in a transfer to Pennsylvania, but was informed that the position had been "cancelled." (Id.)

- **Allegation 20:** On May 3, 2002, Customer Service Supervisor Wanda Stanton accused Noree of performing his duties incorrectly and referred to him as "that stupid Thai guy." (Pl.'s Interrog. Answer at 9.)

- **Allegation 21:** On May 29, 2002, Noree was accused of breaching security by using a video camera in the Minneapolis airport.  (See Pl.'s Interrog. Answer at 10.)  His use of the camera, however, was authorized and Noree was not disciplined.  (See id. at 11.)

- **Allegation 22**: Also in May 2002, while Noree was considering a transfer to Albuquerque, a former manager "painted a very negative picture of the situation" there, and "strongly discouraged him from accepting that position." (Pl.'s Interrog. Answer at 10.)  Noree also received a call from Robert Morando, a Northwest employee from Albuquerque, who discouraged him from accepting the job.  (See id.)  Further, co-employee and union steward Hiar told him to be careful in Albuquerque because "[those] people will do everything they can to destroy you" and to not "rock the boat."  (Id.)

- **Allegation 23:** In June or July 2002, while working in Albuquerque, co-employee Charlene Boggs told Noree that her father had been imprisoned at a Japanese prisoner-of-war camp and was treated poorly, and then said that Noree looked like "an Asian man."  (Pl.'s Interrog. Answer at 11.)  Though a subordinate to Noree, Boggs did not follow his instructions.  (Id. at 12.)  She also mocked him "from time to time," and made fun of his speech "by purporting to speak 'Chinese.'"  (Id.)  Noree reported this conduct to Interim Manager Dave Freeland.  (Id.)  Freeland told Noree that Boggs was "testing" him and that he "should not let Boggs [get] him down."  (Id.)

- **Allegation 24:** On July 8, 2002, Albuquerque co-worker Robert Morando told Noree that he should take an English as a second language class; that he "should go back to your country"; and "repeatedly" mocked his speech by saying "che, choy, chong, chu," or similar words.  (Pl.'s Interrog. Answer at 11.)

IV.     **Events Leading to Noree's Termination**

     A.     **Sisavat Ticketing**

In May 2002, while working in Minnesota, Noree booked a ticket for Chahnday and Khamphy Sisavat for travel to France in July 2002.  At the time the ticket was purchased, Noree gave the Sisavats his business card, which listed his cell phone number.  Although Noree did not socialize with the Sisavats, Noree had heard of Mr. Sisavat because he was well known in the Lao/Thai community due to his status as a colonel in the Lao army during the Vietnam War.  (Noree Aff. ¶ 15.)

Before their departure for France, the Sisavats had difficulty obtaining a visa.  (See Noree Dep. Tr. Ex. 5.)  Mr. Sisavat contacted a Northwest ticketing agent in Minnesota about rebooking their flight to France on a later date.  (Id.)  The ticket agent informed him that it would cost $1,161.48 to change his flight, and entered this information into a computerized ticketing log.  (See Noree Dep. Tr. Ex. 3.)

On August 2, 2002, Mr. Sisavat called Noree, who was then working in Albuquerque.  (See Noree Dep. Tr. at 63-64, 66-67, 70, Exs. 4, 5.)  Mr. Sisavat told Noree about the fee and was upset at how much it was going to cost to change the date of his flight.  (Id. at 64, 71.)  While on the phone with Mr. Sisavat, Noree looked at his computer screen and saw the information that the Minneapolis ticket agent had entered.  (Id. at 80, Ex. 4.)  Believing he had the discretion to solve the Sisavats's problem, Noree changed the date of the Sisavats' flight to August 5, 2002, waived the $1,161.48 fee, charged the Sisavats $150, and paid for it on his own credit card.  (Id. at 84-85; see Noree Dep. Tr. Exs. 4, 5.)  Thereafter,

Noree flew to Minnesota, delivered the tickets, and was reimbursed the $150.  (See Noree

Dep. Tr. at 150-51, Exs. 4, 5.)  Noree did not obtain permission for his actions.  (Id. Ex. 4.)

###### B. Flight to Minneapolis on August 2, 2002

Also on August 2, 2002, Noree asked Freeland, the interim manager, if he could take

a vacation day the next day.  Freeland initially approved his request, but later learned that a

more senior employee sought vacation for the same day and denied Noree's request.  In the

end, Freeland also denied the other employee's request because the Albuquerque branch

was short-staffed.  (See Noree Dep. Tr. at 165-68, 174-75, 181, Exs. 5, 6; Horvath Dep. Tr.

at 61-62, 139.)

About an hour or two after speaking with Freeland, Noree developed a headache.

(Noree Dep. Tr. at 196-97.)  Feeling sick and needing headache medicine, Noree utilized

his reduced rate privilege and booked a flight to Minnesota on Frontier Airlines.[2]  (See id.

at 198-200, 207-11.)  He arrived in Minneapolis at 2:00 AM on August 3, 2002.  (Id. at

211.)

---

[2] It appears that Noree did not have the comforts of home while living in
Albuquerque, as he slept in a van and showered at a local YMCA.  (Noree Aff. ¶ 14.)

### C.     Sick Day on August 3, 2002

Waking up in Minnesota on the morning of August 3, Noree called the manager on

duty in Albuquerque and told him he was out sick.  (Noree Dep. Tr. Ex. 5.)  When Noree

awoke again, his headache was gone and he felt "fine."  (Id. at 216, Ex. 5.)  A few hours

later, he attended his son's taekwondo graduation.  (Id. at 221, Ex. 5.)  Later that night, he

caught a 9:00 PM flight back to Albuquerque so that he could work the next day.  (Id. at

222.)  On August 9, 2002, Noree submitted a request for sick leave pay for August 3.  (Id.

at 225-26, Ex. 7.)

### D.     Northwest's Investigation

In light of the Sisavat ticketing change and Noree's sick leave pay request,

Northwest conducted an investigation.  On August 13, 2002, Horvath and Lahti met with

Noree to ask him specific questions as to each matter.  During a question-and-answer

session, Noree admitted he changed the date on the Sisavats' ticket, saw the ticket agent's

remarks that it would cost $1,168.48 for the change, and only charged $150 without

obtaining permission.  (See Noree Dep. Tr. Ex. 4.)  He also admitted that he used

Northwest's pass travel privilege to fly to Minneapolis on August 2 while he had a

headache, attended his son's taekwondo graduation on August 3, and submitted a sick pay

claim for August 3.  (See Horvath Dep. Tr. Ex. 34.)

###### E.      Termination

Horvath's and Lahti's investigation led them to believe that Noree had engaged in serious ticketing irregularities to the financial detriment of Northwest.  (See Horvath Dep. Tr. at 106-12; Lahti Dep. Tr. at 83-84.)  Their investigation also led them to doubt the genuineness of Noree's claim that he had been sick on August 3.  (See Horvath Dep. Tr. at 114-17; Lahti Dep. Tr. at 84-85.)  They met with the Director of Labor Relations, Gary Soma, and considered the evidence in light of the Rules of Conduct.  (See Horvath Dep. Tr. at 91-96; Lahti Dep. Tr. at 37-38.)  Looking at the facts, Horvath and Soma recommended that Lahti terminate Noree's employment.  (See Horvath Dep. Tr. at 96.)

On August 16, 2002, Lahti issued a termination letter to Noree.  (Noree Dep. Tr. Ex. 1 (the "Termination Letter")).  She gave four reasons for his termination:

> 1.  You inappropriately waived reservation and ticketing rules for your friends.  Specifically, during the spring and summer of 2002, you waived reservation, ticketing and fare rules on numerous occasions for Chahnday and Khamphy Sisavat.  In addition, you failed to collect the appropriate fees for their tickets resulting in a revenue loss of $1175.88.  This action constitutes theft and is a violation of Rules 23, 25 and 30 of The Rules of Conduct For Employees of Northwest Airlines ("Rules of Conduct"); and,

> 2.  You submitted a false claim for sick leave pay.  On Saturday, August 3, 2002, you informed the Company that you would not be able to work you[r] scheduled shift because you were sick.  Evidence indicates however, that you were in fact attending you son's graduation in MSP.  This constitutes falsification of earnings records and claims for pay and is a violation of Rules 25 and 33; and,

> 3.  On Saturday, August 3, 2002, the day you claim to have been sick, you utilized nonrevenue / reduced rate travel privileges to travel from MSP to ABQ.  This is a violation of the Company's Pass and Reduced Rate Travel Policy and Rule 28; and,

4.  You provided untruthful and misleading information in your investigatory
interview on August 13th, 2002, in violation of Rules of Conduct 9 and 10.

(Termination Letter.)

After his termination, Noree, through his union, filed a grievance pursuant to the

terms of his collective bargaining agreement.  At Noree's request, Northwest agreed to skip

a first hearing and proceed automatically to a second hearing.  (See Horvath Aff. Ex. C.)  On

September 25, 2002, Horvath, who served as the hearing officer, denied Noree's grievance.

(See Horvath Dep. Tr. Ex. 54.)  On March 4, 2003, Noree's union determined not to

proceed on Noree's grievance, withdrew its request for arbitration, and took no further

action on Noree's behalf.  (See Horvath Aff. Ex. E.)

## V.      Equal Employment Opportunity Commission Charge and Litigation

On March 7, 2003, Noree filed a Charge of Discrimination with the Equal

Employment Opportunity Commission.  (See Jezierski Aff. Ex. E.)  He alleged race and

national origin discrimination, and stated the following:

I.  On August 16, 2002, the Respondent discharged me from my Customer
Supervisor position.

II.  The Respondent's Reason: Lied about sick leave and conflict of interest.

III.  I believe the Respondent discriminated against me because of my race,
Asian/Pacific Islander, and my national origin, Thai, in violation of Title VII
of the Civil Rights Act of 1964, as amended, by discharging me because I was
sick on the day in question, and White, American Customer Service Agents
have done the same thing, that the Respondent contends was a conflict of
interest for me.

(Id.)  On August 27, 2003, the EEOC issued Noree a Dismissal and Notice of Rights letter, informing him that it was "unable to conclude that the information obtained establishes violations of the statutes," and notified him of his right to sue.  (Brandt Aff. Ex. 45.)

On November 21, 2003, Noree filed a pro se Complaint.  He was subsequently referred to the Volunteer Lawyers Network.  (Brandt Aff. Ex. 46.)  In July 2004, after counsel had entered an appearance on Noree's behalf, an Amended Complaint was filed. The Amended Complaint alleges two counts: (1) harassment based on race and/or national origin in violation of Title VII; and (2) discharge based on race and/or national origin in violation of Title VII.  (Am. Compl. ¶¶ 20-29.)  Northwest's Motion for Summary Judgment followed.

## Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The

15

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

**Analysis**[3]

**I.      Hostile Work Environment**

Noree alleges that he was subjected to a racially and national-origin-based hostile

work environment.  (See Mem. in Opp'n at 42-48.)  To establish such a claim, Noree must

show that: (1) he belongs to a protected group; (2) he was subject to unwelcome

harassment; (3) a causal nexus exists between the harassment and the protected group

status; (4) the harassment affected a term, condition, or privilege of employment; and (5)

his employer knew or should have known of the harassment and failed to take proper

action.[4]  Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir.

2000); Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999).  Harassment which is

severe and pervasive is deemed to affect a term, condition, or privilege of employment.

Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 652 (8th Cir. 2003).  The work

---

[3] Northwest argues that all of Noree's claims are time-barred because his Charge of Discrimination exceeded the applicable 180-day limitations period for filing a charge outside the state he worked in (i.e., filed in Minnesota but worked in New Mexico).  (See Mem. in Supp. at 12-13.)  The Court need not reach this issue because Noree's claims do not withstand summary judgment on their merits.

[4] The final element applies to allegations of non-supervisory harassment, but not to allegations of supervisory harassment.  Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 n.5 (8th Cir. 2000).

16

environment must be both objectively severe, as it would be viewed by a reasonable person, and subjectively severe, as it was actually viewed by the victim.  Id.

In determining whether sufficient evidence of a hostile work environment has been presented, the Court considers all of the attendant circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  Id. at 652-53.  To satisfy the "high threshold of actionable harm," Noree has to show his workplace was "permeated with discriminatory intimidation, ridicule, and insult."  Id. at 653 (citation and internal quotations omitted).  Mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate the anti-discrimination laws.  See id. (citation and internal quotations omitted).

In his memorandum, Noree composes a long list of allegedly harassing conduct that occurred over a period of four years (May 1998 to July 2002), spanning two work sites (Minneapolis and Albuquerque), and committed by different co-employees and supervisors. (See Mem. in Opp'n 10-22; supra Background Part III.)  The numerosity and breadth of Noree's allegations, however, do not alter this Court's obligation to consider whether a genuine issue of material fact exists for trial.  Considering the totality of the allegations, and keeping in mind that the alleged harassment is not to be viewed in isolation, see Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 355 (8th Cir. 1997), the Court finds that no genuine issue of material fact exists on the issue of hostile work environment.

17

The long and the short of it is that the allegations, individually or collectively, are not of such severity and pervasiveness as to constitute a hostile work environment under Title VII. There are several reasons for this conclusion. First, many allegations—Allegations 2, 4, 5, 6, 8, 10, 11, 12, 13, 14[5], 15, 16, 17, 18, 19, 21, and 22—lack a causal nexus between the alleged harassment and Noree's protected status. Second, the accused harassment which arguably possess a causal nexus—Allegations 1, 3, 7, 9, 20, 23, and 24—was sporadic, as weeks or months would pass with no harassment occurring. See, e.g., Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 760 (8th Cir. 2004) (finding racially derogatory statements "were . . . sporadic, no more than one per month"). The statements identified do not constitute a "steady barrage of opprobrious racial comment" sufficient to support a hostile work environment claim. Elmahdi, 339 F.3d at 653. Third, the sporadic harassment was, at worst, offensive, but mere utterance of an epithet does not sufficiently affect the conditions of employment to be actionable. See id. Fourth, none of the harassment was physically threatening. Finally, Allegation 24 also fails because there is no evidence that Northwest knew or should have known of that alleged harassment. See Jacob-Mua v. Veneman, 289 F.3d 517, 522-23 (8th Cir. 2002).

Contrary to Noree's view, this case does not rise to the level of actionable harassment found in Delph v. Dr. Pepper Bottling Co., 130 F.3d 349 (8th Cir. 1997); Diaz v. Swift-Eckrich, Inc., 318 F.3d 796 (8th Cir. 1997), or Jackson v. Flint Ink North American

---

[5] Noree makes no claim of discriminatory discipline arising out of Allegation 14.

Corp., 382 F.3d 869 (8th Cir. 2004) (on rehearing).  In Delph, the plaintiff was subjected to

a "steady barrage of racial name-calling" such as "black boy," "nigger," "token black boy,"

"my little black boy," which "involved more than a few isolated racial slurs."  See Delph,

130 F.3d at 352, 357 (affirming hostile work environment judgment returned after a bench

trial).  In Diaz, the plaintiff was "continuous[ly]" subjected to comments like "Hispanics

should be cleaning," "Hispanics are stupid," "Hispanics should scavenge for beans on the

floor," and "trash paper"; was the target of rude noises and laughing; and was hit twice.  See

Diaz, 318 F.3d at 799-800  (reversing district court's grant of employer's summary

judgment motion).  Finally, in Jackson, the plaintiff's name was written with an arrow

connecting his name to a burning cross and a KKK sign, and he was subjected to comments

such as "that damn nigger," "damn black," "nigger-rigging," "nigger," "damn black music . . .

nigger shit, radio," and "fucking nigger."  See Jackson, 382 F.3d at 870 (incorporating by

reference Jackson v. Flint Ink N. Am. Corp., 370 F.3d 791, 793-96 (8th Cir. 2004) and

reversing district court's grant of employer's summary judgment motion).

    In sum, Noree has failed to establish a hostile work environment claim.  Even when

viewed in the light most favorable to Noree, his allegations do not show that his workplace

in either Minneapolis or Albuquerque was "permeated with discriminatory intimidation,

ridicule, and insult."  Elmahdi, 339 F.3d at 653.  Accordingly, the Court will grant

Northwest's Motion and will dismiss Noree's hostile work environment claim.[6]

---

[6] In light of this determination, the Court need not address Northwest's alternative
arguments that Noree's hostile work environment claim fails because (1) the claim exceeds

## II.	Discriminatory Termination

Noree also alleges that he was unlawfully terminated on the basis of race and national origin.  (See Mem. in Opp'n at 48-53.)  Title VII makes it unlawful for an employer to discriminate against an employee on the basis of race or national origin.  42 U.S.C. § 2000e-2(a)(1).  Because he has not presented direct evidence of discrimination, Noree proceeds under the McDonnell Douglas three-part burden-shifting framework.  (See Mem. in Opp'n at 48.)

Under McDonnell Douglas, Noree must first establish a prima facie case of discrimination.  See Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999).  If he demonstrates a prima facie case, then the burden shifts to Northwest to demonstrate a legitimate, nondiscriminatory reason for the adverse employment action.  Id. If Northwest articulates such a reason, Noree must then demonstrate that the stated reason is pretextual and that the real reason was unlawful discrimination.  Id. at 1157.  At all times, Noree retains the ultimate burden of persuading the trier of fact that the adverse employment action was motivated by intentional discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

### A.	Prima Facie Case

---

the scope of his Charge of Discrimination, and (2) the claim, as it pertains to alleged harassment between February 9, 1998 and May 10, 2002, is time-barred.  (See Mem. in Supp. at 14-17.)

Noree's first task is to establish a prima facie case of discrimination.  To establish a prima facie case, he must demonstrate that (1) he is a member of a protected group; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) circumstances exist which give rise to an inference of discrimination.  Wheeler v. Aventis Pharm., 360 F.3d 853, 857 (8th Cir. 2004).  Northwest has not challenged the first three elements.  (See Mem. in Supp. at 24-25.)  Noree has chosen to satisfy his burden on the fourth element by showing that similarly situated employees were treated more favorably.  (See Mem. in Opp'n at 49-50.)  The test to determine if one is "similarly situated" at the prima facie stage is "not onerous."  Wheeler, 360 F.3d at 857; see Pope v. ESA Servs., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005) ("A minimal evidentiary showing will satisfy [the plaintiff's] burden of production" at the prima facie stage.)  While Northwest strenuously disputes this element, the Court will assume that Noree has met his burden.

### B.      Legitimate, Nondiscriminatory Reason

Assuming Noree has established a prima facie case, the burden shifts to Northwest to articulate a legitimate, nondiscriminatory reason for terminating Noree's employment. Northwest asserts that it terminated Noree for violating various Rules of Conduct.  (Mem. in Supp. at 25-26.)  The Termination Letter specified which Rules of Conduct Noree violated.  (See Noree Dep. Tr. Ex. 1.)  Violation of company policy is a legitimate, nondiscriminatory reason for termination.  See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc).  Noree does not dispute that Northwest has met its burden on this point.

### C.      Pretext

Having produced legitimate, nondiscriminatory reasons, Northwest has shifted the burden to Noree to show that these reasons are pretextual and that the real reason was unlawful discrimination.  See Breeding, 164 F.3d at 1157.  In some cases, however, a "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves, 530 U.S. at 148 (emphasis added).  Noree contends that he has shown that Northwest's reasons are pretextual.  (Mem. in Opp'n at 51-53.)  The Court disagrees.

First, Noree argues that Northwest treated non-Asians who committed similar infractions more leniently.  (See Mem. in Opp'n at 53.)  Instances of disparate treatment can support a claim of pretext, but Noree has the burden of establishing facts that he and the

22

disparately treated non-Asians were "similarly situated in all relevant respects."  Wheeler,

360 F.3d at 858; see Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994).

The test for whether employees are "similarly situated" at the pretext stage is "rigorous."

Wheeler, 360 F.3d at 858; see Harvey, 38 F.3d at 972.  Specifically, Noree must point to

other employees who "have dealt with the same supervisor, have been subject to the same

standards, and engaged in the same conduct without any mitigating or distinguishing

circumstances."  Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (citing Lynn v.

Deaconess Med. Ctr.-W. Campus, 160 F.3d 484, 487-88 (8th Cir. 1998)); see Marquez v.

Bridgestone/Firestone, Inc., 353 F.3d 1037, 1038 (8th Cir. 2004); Gilmore v. AT&T, 319

F.3d 1042, 1046 (8th Cir. 2003).

Noree has identified three non-Asian employees who he contends were treated

differently.  (See Mem. in Opp'n at 31-33.)  Melvin Dickerson, Hattie Webb, and Carolyn

Manino all violated Northwest's Rules of Conduct based upon ticketing misconduct.  (See

Brandt Aff. Ex. 9 at 27-29, 43-47; Exs. 40, 42-43.)  Each person was initially terminated,

but then reinstated at the request of their union after they had grieved their termination.

(Brandt Aff. Ex. 9 at 27-29, 43-47; Exs. 41, 43.)  Noree has not, however, identified the

supervisors who dealt with these employees.  Without these facts, he cannot establish that

he was similarly situated.  See Gilmore, 319 F.3d at 1046; Harvey, 38 F.3d at 972 ("When

different decision-makers are involved, two decisions are rarely similarly situated in all

relevant respects.").  Moreover, like Noree, the three other employees were terminated for

violating the ticketing rules.  While they were eventually reinstated, their circumstances are

distinguishable because the union requested their reinstatement, while it did not do so for

Noree.  (See Van Steenburgh Aff. Ex. D at 29.)

Second, Noree contends that while Northwest says it terminated him because he

waived the Sisavat's's fees in violation of the Rules of Conduct, that reason is "undermined"

by the fact that he was told to use his discretion to fix problems, and was informed that fees

could be waived for passengers who had to change flight dates due to visa or passport

problems.  (See Mem. in Opp'n at 51.)  The problem with Noree's argument, however, is

that while all employees were given generic commands to use their discretion to solve

problems, Northwest had a specific written policy that employees in Noree's position

could not waive fees in excess of $300 without manager permission.  (See Horvath Aff. Ex.

A.)  The generic and the specific policies are easily reconcilable: employees should use

their discretion to solve problems, but if a fee waiver exceeds $300, they have to get

permission.  Although Noree does not recall ever seeing the waiver permission policy

(Noree Aff. ¶ 18), "an employer's failure to inform an employee of what is expected of

[him] is not evidence of discriminatory animus."  Rose-Matson v. NME Hosp., Inc., 133

F.3d 1104, 1108 (8th Cir. 1998) (citation omitted).[7]

---

[7] Noree states in his Affidavit that he observed many Customer Service Agents waive fees for international customers and "do[es] not recall" any being disciplined.  (See Noree Aff. ¶ 8.)  However, he has not identified any particular employees or their supervisors. His unsupported speculation is insufficient to withstand summary judgment.  See Marquez, 353 F.3d at 1038.

Third, Noree asserts that while Northwest states that he was terminated because he made a false claim for sick pay in violation of the Rules of Conduct, that reason raises a jury question because he was actually sick.  (See Mem. in Opp'n at 52.)  That Noree was actually sick and Northwest did not believe him does not demonstrate pretext.  Rather, Noree must produce evidence demonstrating that Northwest "did not believe [Noree] was guilty of misconduct."  Pope, 406 F.3d at 1009 (citations omitted); see Hitt v. Harsco, Corp., 356 F.3d 920, 924 (8th Cir. 2004).  He has not produced such evidence.  On the contrary, the evidence shows that Northwest investigated his sick pay claim and determined that he was not sick on August 3 in light of his attendance at his son's taekwondo graduation.  (See Horvath Dep. Tr. Ex. 33.)  Furthermore, while Noree states he was sick the night of August 2 when he flew to Minneapolis, he admits feeling better the morning of August 3 after he called in sick to work.  (See Noree Dep. Tr. at 216, 221, Ex. 5.)  In light of this evidence, Noree has not demonstrated that Northwest's reason is pretextual.

Finally, Noree contends that Northwest's reasons for terminating him are pretextual in light of an alleged racially biased climate in the workplace.  (Mem. in Opp'n at 52-53.)  Specifically, he points to a Northwest document which recorded his race as "AA" and a note referring to the Sisavat ticketing that lists him as "Phillippines" and the Sisavats as of "Pakistani dissent."  He also points, without specificity, to "the race-related comments made to [him], including those made shortly before he was discharged."  (Id.)  "Evidence of a discriminatory attitude in the workplace, though it may not rise to the level of direct evidence, may . . . tend to show that the employer's proffered explanation for the action was

25

not the true reason for the discharge." Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727

(8th Cir. 2001).  In this case, however, the "AA" notation and the contents of the note do

not establish that the authors (whoever they may have been) harbored race-based animus.

See Calder v. TCI Cablevision, 298 F.3d 723, 730 (8th Cir. 2002).  At best, they are the

type of "stray remarks" that have been held not to support a finding of pretext.  See id.

(citing cases).  As to the other alleged race-based comments, Noree does not specify which

remarks he relies upon, but presumably they are part of the same unactionable conduct

submitted as evidence of a hostile work environment.[8]

Accordingly, because Noree has failed to present sufficient evidence demonstrating

that Northwest's reasons for terminating his employment are pretextual, the Court will

grant Northwest's Motion and dismiss Noree's termination claim.[9]

---

[8] Noree was also terminated because he used the nonrevenue/reduced rate travel privileges while he was sick in violation of Northwest's policy.  He apparently does not challenge this reason as a pretext.  Nor could he, as he argues he was sick.

[9] Had the Court needed to reach the issue, it would have concluded that Noree has also failed to establish a genuine issue of material fact that the real reason for his termination was intentional discrimination.

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED** that Northwest's Motion for Summary Judgment (Doc. No. 62) is **GRANTED**

and Noree's Amended Complaint (Doc. No. 26) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: August 2, 2005                                                s/Richard H. Kyle
                                                                              RICHARD H. KYLE
                                                                              United States District Judge

27